Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

# UNITED STATES DISTRICT COURT

### for the

### Northern District of Georgia

_____ Division

| | | |
|---|---|---|
| **Barry J. Truitt** | ) | **Case No.** **1:25-CV- 0176** |
| | ) | *(to be filled in by the Clerk's Office)* |
| | ) | |
| *Plaintiff(s)* | ) | |
| *(Write the full name of each plaintiff who is filing this complaint.* | ) | **Jury Trial:** *(check one)* ☑Yes ☐No |
| *If the names of all the plaintiffs cannot fit in the space above,* | ) | |
| *please write "see attached" in the space and attach an additional* | ) | |
| *page with the full list of names.)* | ) | |
| -v- | ) | |
| | ) | |
| **City of Forest Park** | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |
| *(Write the full name of each defendant who is being sued. If the* | ) | |
| *names of all the defendants cannot fit in the space above, please* | | |
| *write "see attached" in the space and attach an additional page* | | |
| *with the full list of names.)* | | |

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

**JAN 15 2025**

KEVIN P. WEIMER, Clerk
By: _____ Deputy Clerk

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

### I.    The Parties to This Complaint

#### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | **Barry J. Truitt** |
| Street Address | **3093 Demooney Road** |
| City and County | **Atlanta, Fulton** |
| State and Zip Code | **Georgia, 30349** |
| Telephone Number | **(336) 549-9455** |
| E-mail Address | **barry.truitt5@gmail.com** |

#### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

### Defendant No. 1

| | |
|---|---|
| Name | City of Forest Park |
| Job or Title *(if known)* | Government Agency (Local) |
| Street Address | 785 Forest Pkwy |
| City and County | Forest Park, Clayton |
| State and Zip Code | Georgia, 30297 |
| Telephone Number | (404) 366-4720 |
| E-mail Address *(if known)* | |

### Defendant No. 2

| | |
|---|---|
| Name | Brandon Criss |
| Job or Title *(if known)* | Police Chief |
| Street Address | 785 Forest Pkwy |
| City and County | Forest Park, Clayton |
| State and Zip Code | Georgia, 30297 |
| Telephone Number | (404) 366-4720 |
| E-mail Address *(if known)* | bcriss@forestparkga.gov |

### Defendant No. 3

| | |
|---|---|
| Name | Ricky L. Clark, Jr. |
| Job or Title *(if known)* | City Manager |
| Street Address | 785 Forest Pkwy |
| City and County | Forest Park, Clayton |
| State and Zip Code | Georgia, 30297 |
| Telephone Number | (404) 366-4720 |
| E-mail Address *(if known)* | rclark@forestparkga.gov |

### Defendant No. 4

| | |
|---|---|
| Name | Shalonda Brown |
| Job or Title *(if known)* | Human Resources Director |
| Street Address | 785 Forest Pkwy |
| City and County | Forest Park, Clayton |
| State and Zip Code | Georgia, 30297 |
| Telephone Number | (404) 366-4720 |
| E-mail Address *(if known)* | sbrown@forestparkga.gov |

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

## C.    Place of Employment

The address at which I sought employment or was employed by the defendant(s) is

| | |
|---|---|
| Name | City of Forest Park (Police) |
| Street Address | 785 Forest Pkwy |
| City and County | Forest Park, Clayton |
| State and Zip Code | Georgia, 30297 |
| Telephone Number | (404) 366-4720 |

## II.    Basis for Jurisdiction

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

☑    Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note: In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐    Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note: In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

☐    Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

*(Note: In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐    Other federal law *(specify the federal law)*:

_____

☐    Relevant state law *(specify, if known)*:

_____

☐    Relevant city or county law *(specify, if known)*:

_____

## III.    Statement of Claim

Write a short and plain statement of the claim.  Do not make legal arguments.  State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought.  State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

A.    The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

☐    Failure to hire me.

☑    Termination of my employment.

☐    Failure to promote me.

☐    Failure to accommodate my disability.

☑    Unequal terms and conditions of my employment.

☑    Retaliation.

☑    Other acts *(specify)*:    Religion, hostile workplace, and unequal treatment as my peers.

*(Note:  Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)*

B.    It is my best recollection that the alleged discriminatory acts occurred on date(s)

07/27/23,10/24/23,10/27/23,11/12/23,11/20/23,11/21/23,11/24/23,12/4/23,01/30/24, & 02/28/24-06/10/24

C.    I believe that defendant(s) *(check one)*:

☑    is/are still committing these acts against me.

☐    is/are not still committing these acts against me.

D.    Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

☑    race             Black

☑    color            Black

☑    gender/sex       Male

☑    religion         Rastafarian

☐    national origin

☐    age *(year of birth)*            *(only when asserting a claim of age discrimination.)*

☐    disability or perceived disability *(specify disability)*

E.    The facts of my case are as follows.  Attach additional pages if needed.

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

Fact 1: On 05/04/2024, I was informed by my police Sergeant to confiscate a Polkadot candy bar, due to it being "mushroom infused".
Fact 2: On 05/04/2024 I reported a co-worker for misconduct when he tampered with evidence bag in my presence and removed a piece of the Polkadot brand chocolate bar (mushroom infused).
Fact 3: The Chief of Police Brandon Criss stated that it was a controlled substance, but later I determined the drugs to be legal and sold openly across the State of Georgia.
Fact 4: The Chief of Police Brandon Criss terminated me on 05/22/2024 for not reporting through my chain of command, consenting to Elhadi's tampering of evidence, and failing to take action when Elhadi took possession of an illegal "controlled substance" in my presence. Additional facts attached.

*(Note: As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

## IV.    Exhaustion of Federal Administrative Remedies

A.    It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*
July 29, 2024

B.    The Equal Employment Opportunity Commission *(check one)*:

☐    has not issued a Notice of Right to Sue letter.

☑    issued a Notice of Right to Sue letter, which I received on *(date)*    **11/12/2024**        .

*(Note:  Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

C.    Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

☐    60 days or more have elapsed.
☐    less than 60 days have elapsed.

## V.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Direct Action: To be Fully Re-instated as a Sworn Police Officer for the City of Forest Park
Economic Compensatory Damages: Current Salary at Termination approximately $55,000 x 30 (years)=
$1,650,000 without economic adjustment and/or promotion. $100,000 x 30 (years)= $3,000,000 with promotions
and economic adjustments.
Non-Economic Damages: Mental Anguish (lifetime): $2,500,000 Reputation (lifetime): $2,500,000 Humiliation:
$2,500,000, The Loss of Enjoyment of Activities (lifetime): $2,500,000, Counseling: $600,000 (60 years)
Punitive Damages: $250,000
Total: $13,850,000

## VI.   Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information,
and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause
unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a
nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have
evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable
opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the
requirements of Rule 11.

### A.       For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be
served.  I understand that my failure to keep a current address on file with the Clerk's Office may result
in the dismissal of my case.

Date of signing:          01/12/2025

Signature of Plaintiff

Printed Name of Plaintiff     Barry J. Truitt

### B.       For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

**SENT VIA ELECTRONIC MAIL AND EEOC PORTAL**

Ivan Garcia, Federal Investigator
U.S. Equal Employment Opportunity Commission
100 Alabama Street, SW, Suite 4830
Atlanta, Georgia 30303
Email: ivan.garcia@eeoc.gov

RE:      **Barry Truitt v. Forest Park, Georgia, Charge No. 11B-2024-00412**
         **Charge Response**

Mr. Garcia:

## I.      INITIAL BACKGROUND (RESPONSE)

### *CRITICAL INCIDENTS DURING MY EMPLOYMENT WITH THE CITY*

1.  I began work on July 24, 2023 with the City of Forest Park as a Police Recruit. I was
    working alongside current Officer Green, Officer King, and Officer Jones (we all were
    former police recruits slated for the police academy). On week one we were all lined up
    and subject to excessive hair reviews by the Police Chief Brandon Criss with the City of
    Forest Park who stated that he gets his hair "cut twice a week" and stated that I needed a
    trim. Naturally I felt uncomfortable and out of place. Chief Criss consistently lined us
    recruits up and recommended that we all cut our hair. Officer Green, Officer King, and
    Officer Jones can and will corroborate this statement. We all complained of the excessive
    hair reviews to our immediate superior Lt. Anderson. We were routinely informed that it
    was a part of the "process". I documented every time I felt discriminated against during
    the hair reviews and even when I was a Sworn Police Officer.

2.  On October 23, 2023 I began my first shift as a Police Officer and was assigned to ride
    with Field Training Officer (FTO) Greene a law enforcement officer with 11 years of
    experience. We would ride together for 12 hours during the nightshift from 7pm-7am
    while she trained me and assisted me to become a better officer. On October 24, 2023, I
    received my first verbal counseling by my FTO, Officer Greene. I informed her that I was
    Rastafarian and that I did not believe in cutting my hair. This was the beginning of the
    future Hostile Workplace Environment I believed to Initially be created by FTO Greene.

    On October 27, 2024 I was questioned multiple times by FTO Greene about my religious
    and personal beliefs about my facial hair and mini-afro on my head at the time. I felt
    isolated and began to question if policing was the right profession for me.

On November 12, 2023, Officer Rice was conducting a traffic stop and he was on the passenger side of his patrol vehicle speaking with the offender. I pulled behind Officer Rice to ensure his safety by motorist traveling pursuant to Georgia Code, Title 40-6-16 which states that drivers must move over one lane, when possible, for emergency vehicles with flashing lights parked on the shoulder of Georgia highways. And if traffic is too heavy to move-over safely, the law requires drivers to slow down below the posted speed limit instead AND be prepared to stop.

I then observed a car traveling at a very high rate of speed pass both of our emergency vehicles without moving over a lane although it was possible. They also did not slow down below the posted speed limit, and they were not prepared to stop. I pulled out and began to initiate a traffic stop on the vehicle. Greene asked me why I was going to stop them. I told her because they did not move over, and they were traveling at a high rate of speed, much higher than the posted speed limit. She said, "No you can't pull them over". Then, with a very belittling, condescending, toxic, and negative tone stated, "Tell me how the Officer was in danger if he was at the passenger side window talking". I told her the law was made with the presumption of the officer being in inherent danger with a car traveling in the immediate lane parallel to the emergency vehicle. Green again stated in the same tone, "Tell me how the Officer was in danger". I thought for a second and decided to disengage the traffic stop because I was afraid if I continued the traffic stop, I could be written up for insubordination. I later googled the Georgia move-over law **and** started to ask Green about it in a very open way and she cut me off and we never discussed it again. This was the approximately 1.5 workdays after the Rastafarian conversation. I believe her hostile treatment towards me was directly correlated with the aforementioned conversation. On November 12, 2023 my daily work reports that were completed by FTO Greene began to drop in ratings. From 4 out 5 to 2 out of 5 or 1 out of 5 on a consistent basis.

3. On November 20, 2023, at approximately 11pm, I observed a car on Jonesboro Road driving very slowly without any headlights on. I made a U-turn in my patrol vehicle and began to initiate a traffic stop on the vehicle, as I caught up to them, they turned on their headlights. Greene said, "You can't pull them over now because they have their headlights on now". I told her, I observed them without their headlights which is a law violation, and I can still pull them over. On this occasion I decided to be insubordinate and follow state law which states they must have headlights on due to visibility and safety of other motor vehicles. I proceeded to initiate a traffic stop in which she was visibly infuriated. I insert the driver of the vehicle's information through NCIC/GCIC and gave him a warning for the headlights. As we got back in the car, I observed her throw a clipboard onto the dashboard. She was visibly frustrated, upset, and

unprofessional. She decided not to speak with me for approximately an hour. I guess she presumed I was being insubordinate, disrespectful, combative, but according to Georgia state law I was simply doing my job. I also believe this incident was directly correlated to the conversation we had about my religion Rastafari. She did not seem happy with me being a Rastafarian in a Police uniform. Needless to say, my daily workplace report ratings were all well below my usual average. I was just surprised and happy that I did not get written up for insubordination, but I knew it was in the works. Not many new officers fresh out of the Police Academy knew the state laws like I did. She was not too fond of this fact. This was the same date I was reported for arriving tardy and without having my duty belt on. I was actually not tardy, but I did not dispute it because I was a new Officer and I did not want to rub anyone the wrong way. I did not have my duty belt on because many of my co-workers such as Officer Welles never arrived to work with their duty belt or vest on. I believe I was guardian tracked because I was the newest Officer on the team. I did not complain. I admit I should have had my duty belt on, but I was not tardy. Captain Kayla Gant stated that I was tardy and that I did not have my duty belt on. She is also the same Captain that I will mention in more detail later for workplace harassment because of my hair and religion on multiple occasions. I believe the negative events of the entire day was rooted in my religion and not agreeing to cut my hair.

4. On November 21, 2023, I and FTO Greene were dispatched to a missing person call to find there was a 21-year-old male hanging in the backseat of a car with a 15-year-old female. FTO Greene immediately detained the female, and the male was later arrested. The 21-year-old male's pregnant girlfriend arrived on scene very emotional to pick up the car. The girlfriend of the offender was cursing and visibly upset with the 21-year-old male, and she asked to speak with the 15-year-old who was detained with her hands cuffed in the backseat of patrol vehicle. Greene began to escort the girlfriend over towards the 15-year-old juvenile. Immediately stopped them both and told my Field Training Officer that she does not have any rights or reasons to speak with the 15-year-old. I told Greene she is a juvenile and she cannot speak with her without the mother's consent. The mother was on scene, and she had already told us that she did not want her 15-year-old daughter to speak with the girlfriend of the offender out of fear of what could possibly happen to her daughter. Greene said "Ok", but it was clear in her demeanor she did not appreciate me a new officer stopping her in the middle of the incident to inform her that she legally could not do that. I did not mind because I was just doing my job. The mother of the 15-year-old girl later thanked me for stopping them both from approaching the patrol vehicle. This incident was critical in adding to the already hostile workplace environment. Needless to say, my daily workplace reports were well below my average again. We also had another verbal counseling later that night about my hair.

5.  On November 24, 2023 I, and Sgt. Greene were in the car reviewing my report on a driver without car insurance. This is a time that is widely known as teaching new officers how to get better at report writing. For Sgt. Greene it's a perfect time to belittle, be negative, and bring more toxic energy to the table. Greene asked me, "Why did you put Officer discretion in your report, that's not what discretion is". I replied, I only wrote that because I told the offender that I do not have any officer discretion when it comes to no car insurance. Greene stated, in her general belittling and unwelcoming tone, "That's not what Officer discretion means". As I began to ask her what it means she said, "Just let it go". I said why would you ask me a question and when I respond get mad and cut me off. Greene said, "I am not going to entertain you". I told her that does not make any sense. Greene said, "Nothing ever makes sense to you Truitt". I told her everything makes sense to me, but that doesn't make any sense. She began to huff and puff once again and told me to let it go. Which is when I drove around for approximately 5-10 minutes of silence. I decided to raise a supervisor on the radio to meet with me at the department. The supervisor Lt. Amy stated she was "on the way" to the police headquarters to meet with me. Upon arrival to the department, I exited the patrol vehicle and walked inside to the watch office to wait for the supervisor. About 5 minutes later, Greene entered the building and began to yell from down the hall. She said per her usual condescending and belittling tone of voice, "You need to get back in the car with me". I informed her multiple times that I would like to wait for the supervisor because the supervisor already instructed me to meet her at the police headquarters. She then walked to the watch office and stated I need you to leave the watch office, I immediately obliged and went to the roll call room to wait for the supervisor Lt. Amy. She then stated that she was going to write me up for insubordination if I did not get back into the car with her. Then she stated the supervisor will not be back until 6 am (two hours). I said, ok I will wait until 6 am because she instructed me to meet her at the police headquarters. Then Greene stated that the supervisor said to go home, and we will address it the next day I return to shift. I said it sounds great, grabbed my belongings, and immediately exited the building. I requested a change in Field Training Officers. **This is the incident in which I was written up for insubordination for refusal to follow the direct order of getting back in the car with FTO Greene, which resulted in final warning and dismissal recommendations. On December 4th 2023, I received a one-day suspension due to this incident thanks to the assistance of Lt. Amy for telling her superiors Captain Gant and Major Jones that I was instructed to meet with her and to reduce the insubordination penalty to keep me employed with the City of Forest Park because I was a great asset to the team.**

## II.    <u>BACKGROUND CONTINUED (Response)</u>

1. On January 30, 2024, I was called into the police headquarters immediately after speaking in front the City Council due to a work-related incident where I was inured (tweaked my ankle) while chasing down a wanted child predator at gunpoint to capture him in the wood line near Old Dixie Hwy. I had to meet with city council due to the injury. From this point on my religion and appearance became a topic of discussion almost daily. I was informed that the City Manager Ricky Clark called the Police Chief Brandon Criss to complain about my hair after the city hall meeting. My Lieutenant Amy was the person to call me in, she was visibly frustrated with all the complaints about my hair. She stated "Ain't nothing wrong with your hair". She then stated "Ain't nothing wrong with his hair" to my new Field Training Officer Jamal Hunter. Both Lt. Amy and K9 Officer Hunter will corroborate these statements. Lt. Amy went on to tell me to turn around and said she does not understand what the problem is with my hair. K9 Hunter was in complete agreeance and stated that my hair is perfectly "fine". The verbal counseling was simply her telling me that she has be called by her superior Captain Kayla Gant and was infirmed to tell me that I need to cut my facial hair and because it was not in department standards. During this conversation, I mentioned a fellow co-working Officer Singh who is Sikh by religion and he also does not believe in cutting his hair. I simply stated that I don't understand their problem with me when we have an Indian police officer whose religion also does not permit the cutting of hair. He has never had a conversation with anyone of the command staff not his supervisors about his hair. I know this because we were both promoted to the Special Operation's Division NET Unit approximately a month after this verbal counseling. During the conversation with Lt. Amy I expressed dissatisfaction with the departments treatment of me because of my hair. I reluctantly agreed to cut my facial hair, because I was still in Field Training and I did not was to be terminated nor did I want to continue to have the issues about my hair because my performance as a police officer was excelling under my new field training Officer Jamal Hunter (Ex. P, January 30, 2024, Verbal Counseling Facial Hair).

2. On February 28, 2024, I completed my last day of Field Training, I was also immediately promoted to the Special Operations NET Unit which is known for having the best Police Officers in the department. The NET Unit consisted of two teams, Alpha and Bravo. Ironically, I was assigned to Bravo team which consisted of a female police officer with 20 inch dreadlocks, Officer Wise, and an Indian Officer Singh who was of the Sikh religion, similar to the Rastafarian religion, in Sikhism they don't believe in cutting their hair neither. My supervisor was Sgt. McDonald and Lt. Wilkerson.

3. On March 04, 2024, I received complaints of my "afro" from Lt. Wilkerson who was simply reporting to me from Captain Gant (Police Captain of all patrol officers) that my

afro was unacceptable and that something needed to be done. Lt. Wilkerson will corroborate this statement.

4. On March 06, 2024, I reported to duty with "starter locs" (the initial phase of twisting ones hair from an afro to transition to dreadlocks). I received complaints literally from Captain Gant to Lt. Wilkerson before I even entered the building because Captain Gant was in the parking lot when I arrived. Captain Gant called Lt. Wilkerson to tell him about my hair (starter locs) and that she did not approve and that something needed to be done. Lt. Wilkerson, Sgt. McDonald, Officer Wise (Dreadlocks), and Officer Singh (Sikhism) will all corroborate this statement. We were all in roll call when Lt. Wilkerson came in to talk to me about my hair, Lt. Wilkerson stated that it looks "alright to me" but went on to state that he had received multiple calls so that he had to come check. The same day I felt pressured and changed my hairstyle, I took down the starter locs.

5. On March 9, 2024, I had a conversation with many command staff Captains. Captain Lloyd Owens told me that the Chief was not pleased with my hair and that I need to change it because it was a "fucking ugly ass afro". Police Captain Owens will corroborate this statement, he also stated that Chief Brandon Criss said it was unprofessional and unacceptable. I had my sister braid my hair immediately after work.

6. On March 13, 2024, I received "braid" complaints from Captain Kayla Gant and from City Hall again about the quality of my braids.

7. On March 17, 2024, I changed to new braids due to harassment and complaints rooted in my hair and religion. Sgt. McDonald, Officer Wise and Officer Singh will corroborate this statement.

8. On April 14, 2024, I changed to new braids due to harassment and complaints about the quality of my braids. Sgt. McDonald, Officer Wise and Officer Singh will corroborate this statement.

9. On May 02, 2024, I changed to new braids due to harassment and complaints from Captain Gant. Sgt. McDonald, Officer Wise and Officer Singh will corroborate this statement.

10. On May 04, 2024, I reported Police Misconduct (legal over the counter candy like drug).

### III.    **Termination Background(Response)**

On May 4, 2024, I conducted a traffic stop that led to the discovery of what was suspected to be a controlled substance by my immediate supervisor Sgt. McDonald (Mushroom White Chocolate Bar) and a green leafy substance the accused stated was marijuana. This traffic stop generated an informant due to his compliance and willingness to cooperate. The evidence collected was suspected marijuana and a marketed substance that took the physical form of a candy bar infused with a psychedelic. My supervisor, Sgt. McDonald was present during the stop when the evidence was collected, and no arrest was made at that time. I asked Sgt. McDonald what we should do with the candy bar and he asked what was stated on its package. I responded, "mushroom infused." Sgt. McDonald stated we have to "16 him," which is our police signal/code for taking him into custody/jail and confiscate the "drugs". Shortly after the stop, Sgt. McDonald and I reported to the precinct and used an unmarked vehicle, with the new informant from the stop, in identifying a potential target location involved in distributing the suspected controlled substance collected during the stop.

The Polkadot brand mushroom-infused candy bar contains Amanita Muscaria which is not regulated by the Controlled Substances Act. My further research of this product indicates that possession and use of this product do not fall under federal drug laws. The Polkadot brand is openly sold in gas stations/convenient stores throughout the State of Georgia (LEGAL).

During this same shift I returned to my patrol vehicle and drove to a location where a workplace acquaintance and fellow officer of Forest Park Police Department was working a parttime job. I intended to complete the report from the investigation, as explained above, while standing-by with Ofc. Elhadi. As a new officer in law enforcement, I attempt to expand my knowledge and experience by discussing duty-related incidents and sharing information for continuous feedback among my peers. Unfortunately, on this occasion it seems that I was taken advantage of by a fellow officer.

Ofc. Elhadi was interested in the suspected contraband from my investigation. I still had these items in my possession because my unit submits evidence at the end of shift. Ofc. Elhadi inquired about what it was and wanted to see it in-person. I showed him the evidence bag that contained the items and Ofc. Elhadi was particularly interested in the substance that was in the form of a candy bar. I was under the assumption that his inspection of this evidence would provide feedback regarding drug recognition by other law enforcement. To my surprise, Ofc. Elhadi broke a section of the substance off and handed back the evidence bag and remaining contents. Additionally, Ofc. Elhadi told me, "Not to tell anyone" about his taking some of the evidence.

As a new officer with the Forest Park Police Department, I was concerned as to what must be done about this incident. This was especially confusing given the fact that this was the first time I had ever seized controlled substances. The circumstances were that of submitting this evidence without an arrestee involved – due to the nature of utilizing a confidential informant. Having no training on (1) handling confidential informants, (2) safekeeping of contraband prior to submitting it as evidence, (3) how to properly report a policy violation by a fellow officer, or (4) how to confirm the particular substance was a controlled substance, I reached out to other sworn officers that I know. These were officers in other agencies that provided some advice on what I should do about this incident before my shift ended.

I reported this incident to Forest Park Police Department Internal Affairs approximately 45 minutes after leaving the Forest Park Police Department and approximately 3-4 hours after observing Ofc. Elhadi's actions. I contacted Officer Malone of Internal Affairs via email requesting his phone number at approximately 10:45 P.M. Within 10 minutes I was provided with his phone number and I immediately called him. However, I did not contact my immediate supervisor Sgt. McDonald in my chain-of-command due to not knowing that I was supposed to contact a particular supervisor to open an Internal Affairs investigation. I was unaware that only the Chief of Police could start an Internal Affairs investigation. Additionally, I had not received any training related to initiating an Internal Affairs complaint.

**ALLEGED POLICY VIOLATIONS:**

      PD SOP 04-01: CODE OF CONDUCT POLICY

      PD SOP 5-01-01: STANDARD OF CONDUCT

**RESPONSE TO ALLEGATIONS:**

The basis of the violations purported in my proposed Disciplinary Actions are very specific in that my charges are based upon:

    (1)    Not reporting my complaint through my chain-of-command;

    (2)    Consenting to Ofc. Elhadi's tampering with my evidence; and

    (3)    Failing to take action when Ofc. Elhadi took possession of a "controlled substance"

As previously addressed, I have not encountered any of the aspects within the circumstances I was faced with during this incident. I did not ignore the issues but considered it a perplexing intra-department conflict by how Ofc. Elhadi's conducted himself in my presence. When later interviewed as the more culpable party of this incident, he made false statements in his favor pertaining to being offered the candy bar. My lack of experience and training in handling this conflicting matter came to light immediately after the incident. The evidence was later submitted in the only condition that I was able to retain it after the incident. And the reason for this slightly altered condition was explained to I.A. at around the time I submitted the evidence. The allegations against me are a generalized application of what I could have done better in reporting the incident. The lack of training and experience regarding the issues presented to me in this matter made my ultimate decision very challenging. I believe the manner of safekeeping

the tampered evidence and awaiting a moment to directly report another officer's misconduct was conducive in maintaining my integrity. Despite the fact that the item Ofc. Elhadi tampered with was not a "controlled substance," I did not have the legal capacity or supervisory authority to give another officer a direct order. Additionally, having observed Ofc. Elhadi's actions done so blatantly in my presence, my suspicions arose as to what type of misconduct may be overlooked by the police department thus far. The only trustworthy approach I could consider that evening was to notify I.A. unit directly.

## CONCLUSION:

During Ofc. Elhadi's recorded interview with I.A. he admitted to breaking off a piece of mushroom infused candy bar and telling me "not to tell anyone." Also, during his recorded interview with I.A., Elhadi admitted to ingesting the candy bar while working his part time job (in uniform and in his marked patrol vehicle). When asked by other police officers why Elhadi lied on Ofc. Truitt, he told them that he "had to do what he had to do." Elhadi was allowed to resign in lieu of termination. I was terminated even though I came forward with the information that opened the I.A. investigation. I was truthful and cooperative throughout the entire investigation.

After further research, the candy bar should not be considered evidence. It is a legal consumable which was not recognized as such during my investigation. In fact, my on-scene supervisor's orders during the investigation indicated that this would be contraband seized during an arrest. The I.A. investigators never realized that the evidence was in fact legal which would have changed the entire findings of case. I was provided an opportunity to have an interview with the chief of police prior to the final decision of the recommended disciplinary action (termination). I was permitted to have counsel present during this final meeting which was considered the informal appeal to the department head. During my conversation with the chief, his decisive focus was on the premise that a controlled substance, in violation of V.G.C.S.A., was taken away from my custody by another officer in my presence.

This perspective gave rise to the opinion that my inaction during Ofc. Elhadi's committing a theft and having possession of a controlled substance was the main concern. However, as explained above, that interpretation of criminal conduct I observed is not accurate. I observed Ofc. Elhadi interfere with property in my custody that would not be used as evidence in a prosecution of the informant from whom it was seized.

There was also never a case attached to the evidence it was simply for safekeeping. Furthermore, I did take action in the best way I could proceed within a short time frame of the incident.

**EXHIBITS**

#1:  Evidence Slip
#2:  Truitt Dismissal Rec
#3:  Internal Affairs File (PDF file)
#4:  Internal Affairs Interviews ( 4- MP3 files)

## Facts:

- The drugs were determined to be legal (independently), also no arrest was made, no evidence to attach to any criminal act
- Constant verbal counseling's and harassment about hair and religion throughout my entire tenure with the City of Forest Park from July 2023-May 2024
- Officer Singh religion is Sikhism, similarly situated individual was treated more favorably.
- Officer Singh religion is Sikhism, never counseled about his long facial hair (longer than mine).
- Officer Wise has dreadlocks and was never counseled about her hair (longer than mine)
- Officer King, similarly situated individual outside of protected class treated more favorably (low cut).
- Officer Welles, similarly situated individual outside of protected class treated more favorably (bald).
- Officer Brown, similarly situated individual outside of protected class treated more favorably (low cut).
- Officer Rice, similarly situated individual outside of protected class treated more favorably (low cut).
- Officer Jones, similarly situated individual outside of protected class treated more favorably (mid-cut).
- I did not accept resignation in lieu of termination, due to my stance of the truth.

## Opinion:

Legal counsel believes I was retaliated against due to my religion beliefs and this was this only chance they could create to get rid of me. The officer who comes forward with police misconduct is usually rewarded not terminated. Some believe it was a mix of the religion and the whistleblowing that got me terminated because I told on a fellow officer. No one on my entire shift thought I would be fired for telling what I witnessed. The entire police department was surprised with the findings and advised the Chief not to terminate me. Chief terminated me due to my repeated subconsciously rebellious attitude when it came to my hair and religion. Chief has to listen to the City Manager Ricky Clark and he had a huge problem with my appearance on multiple occasions. Every single one of my supervisors can attest and corroborate the statements and harassment I received during my time at the City of Forest Park.

## **Conclusion (Continued)**

I sincerely hope that you all can see the entire picture and the harassment I received while serving the City of Forest Park and placing my life on the line. The constant maltreatment and discrimination is evident by my peers. I am not sure if you all will interview them, but if so, it will be blatantly clear that I am a very honest, humble, reliable and relaxing individual. I was always the first one to show up to roll call and the last one to leave for the day. I was a hard-working individual who happens to be Rastafarian. Growing up in Southwest Atlanta and Graduating from Mays High, I know being a Rastafari is unfortunately still not widely accepted, even amongst the black-African Americans in the workplace. Forest Park is a great city and I have nothing bad to say about the city nor the Police Chief.

I just simply ask that you all see and view the facts and totality of circumstances. We cannot continue to treat people this way and expect nothing to happen as a organization. I understand it may not be commonplace in policing to have a Rastafarian patrolling, but my only question is why is it not a problem when the Indian that practices Sikhism with similar beliefs does not cut his hair, because it's straight? I am truly sorry for being born with kinky hair, but I love it and fortunately we have laws that protect my hair and my religion. You all cannot understand how frustrating it was to have perfect example sitting right next to me every day on the specialized unit who also does not believe in cutting his hair, but never to be questioned, not even once. When I asked my co-workers and members of the command staff why he did not have to cut his hair and why was he not harassed. The response was because he has known the Police Chief Brandon Criss for 10 years during his policing career prior to becoming a City of Forest Park employee and Chief Criss personally invited him to the department. I understand favoritism exist in society, but it should not be to the demise of one. I will conclude with; a reasonable and prudent person can conclude that I was not terminated because of failing to act in the moment when Elhadi took the legal drugs out of the safekeeping bag. I have no bad bone in my body, which is why I reported him. It took me 3-4 hours simply because I was a new officer and fresh out of the academy. Even the internal affairs officers with over 25 years of police service stated that they had never seen a case like this one. They both also assured me that I "had nothing to worry about" and that they were proud of me for coming forward. In either case, If I were an EEOC investigator, based on the facts it is clear that I was harassed about my hair and religion which effected my job. There were many similarly situated individuals inside and outside of the protected class treated more favorably.

Unfortunately, I was the only Rastafarian at the Police Department. It was easy to outcast and ostracize me based on Religion and my personal beliefs.

Best Regards and One Love,

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Atlanta District Office**
100 Alabama Street, SW, Suite 4R30
Atlanta, GA 30303
1-800-669-4000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

### Issued On: 11/12/2024

**To:** Barry Truitt
3093 Demooney Rd
Atlanta, GA 30349
Charge No: 11B-2024-00412

**EEOC Representative and email:**      **IVAN GARCIA**
Senior Federal Investigator
nicole.diggs@eeoc.gov

---

## DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By:Darrell E. Graham
11/12/2024
Darrell E. Graham
District Director

**Cc:**
Shalonda Brown
City of Forest Park
785 Forest Pkwy
Forest Park, GA 30297


Please retain this notice for your records.

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 11B-2024-00412 to the

Enclosure with EEOC Notice of Closure and Rights (01/22)

District Director at Darrell E. Graham, 100 Alabama Street, SW Suite 4R30, Atlanta, GA 30303.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 11B-2024-00412 to the District Director at Darrell E. Graham, 100 Alabama Street, SW Suite 4R30, Atlanta, GA 30303.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.